IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INDUSTRIAL KINETICS, INC. | ) | |
| | ) | No. 12-cv-03459 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| CINETIC AUTOMATION CORPORATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Industrial Kinetics, Inc. ("IKI") filed a complaint seeking declaratory judgment that a joint venture agreement exists between it and Defendant Cinetic Automation Corporation ("Cinetic"), and alleging breach of joint venture agreement, breach of fiduciary duty, misappropriation of its trade secret in violation of the Illinois Trade Secret Act (765 ILCS 1065/1 *et seq.*), unjust enrichment, and unfair competition. Cinetic has filed a motion for summary judgment on all counts, which the Court grants in part and denies in part for the reasons set forth below.

**BACKGROUND**

The following facts are undisputed. In 2010, Caterpillar wanted to maximize the efficiency of its vehicle engine assembly line in its Griffin, Georgia manufacturing facility by using robotics instead of humans to perform various tasks to create the final engine. The Caterpillar Turnkey Automated Piston Sub-Assembly System ("CACS") was its solution. To implement the CACS project, Caterpillar sought a general contractor to handle all aspects of the design and installation of the robotic assembly line. Cinetic bid on and ultimately obtained a contract to design and construct the CACS. It is the events surrounding the development of the concept and design of the CACS and the overhead conveyor system that was incorporated into the CACS design that is the subject of this litigation.

As a part of its overall bid, Cinetic included a design for a conveyor system that would transport the various parts of the robotic assembly line. Initially, Cinetic developed a loop layout for the conveyor system where the conveyors were arranged in a loop on the Griffin factory

1

floor, allowing empty pallets to be returned to the beginning of the assembly line after the engines are assembled by the robots. This loop layout proved unworkable for Caterpillar because Caterpillar sought to save more space on the factory floor. The Caterpillar CACS project manager, Larry Malnar, spoke with Dave Holt, Cinetic's Account Manager for the CACS bid, and suggested that Cinetic work with IKI as the conveyor supplier. IKI was Malnar's former employer and had worked with Caterpillar on various projects over the past approximately nine years. IKI had worked with Caterpillar on projects at the Griffin facility and also on earlier versions of the CACS.

In late September 2010, Cinetic and IKI began discussing the prospect of them working together to prepare the CACS bid. Holt, called IKI's Jerry Post to discuss the CACS project. They met and discussed the prospect of IKI providing the conveyor for the project. On October 7, 2010, Cinetic sent Power-Pack, another conveyor supplier, and IKI the same request for a quotation and a drawing that included specifications for the CACS conveyor loop design. IKI submitted its budget proposal for the loop conveyor on October 15, 2010. Power-Pack submitted its budget proposal for the loop conveyor about one month later, on November 10, 2010.

IKI and Cinetic worked together from October 2010 through April 2011 to prepare the conveyor proposal for the CACS bid. On December 3, 2010, Post requested from Cinetic a revised layout of the linear loop design that Cinetic initially proposed so that IKI "[could]start pricing." (Dkt. 68, Cinetic SOF Exh. L.) On December 13, 2010, Post emailed an update to Holt and Drabczyk regarding the CACS layout that IKI developed and discussed directly with Malnar, and attached a concept drawing to the email. (Dkt. 70, IKI SOF Exh. H.)

In an email to Malnar dated December 17, 2010, Holt suggested that the CACS use an overhead pallet return similar to the conveyor used in Caterpillar's Seguin, Texas plant. (Cinetic SOF Exh. M.) Using the overhead pallet return, the empty pallets are lifted via elevators and suspended along conveyors over the factory floor and returned to the beginning of the assembly line. Holt included a concept drawing but it is unclear whether the drawing was developed by Cinetic or IKI's engineers. In January, via email, Holt told Malnar that "Cinetic is finalizing a layout with IKI[.]" (Dkt. 70, IKI SOF Exh. I.) In the same email chain, Malnar replied to Holt's email regarding space concerns, stating:

2

> "We are still working with both you and Jerry [IKI] to make the smallest floor plan that is practical. I believe you were looking into a smaller pallet length based on the information we provided to you on your visit in November. Jerry is also looking into pallet return conveyor. Discussing that with him yesterday, the overhead return conveyor is very attractive preserving aisle ways and floor space." (*Id.*)

In the meantime, between December 2010 and April 2011, Cinetic, IKI and Caterpillar worked on revising the CACS layout and overhead conveyor system design. The last document that IKI submitted to Cinetic containing pricing information and drawings occurred on April 11, 2011. The document's subject line stated "Proposal for Assembly Loop" and included the statement: "THERE ARE NO AGREEMENTS OR ORAL UNDERSTANDINGS OUTSIDE OF THIS PROPOSAL. This proposal shall become a contract when accepted by the Buyer [Cinetic] in writing and approved by an authorized executive of Industrial Kinetics, Inc." (Emphasis in original.) (IDkt. 70KI SOF Exh. U)

On or around August 6, 2011, Caterpillar awarded the contract to Cinetic and issued the first of two purchase orders to Cinetic for the CACS. The first purchase order incorporated IKI's pricing for the CACS design and conveyor system, which Caterpillar agreed to pay $1,575,000 for conveyor system and $79,000 for the system controls. Caterpillar eventually paid Cinetic $1,844,320 for the conveyor system.

On August 31, 2011, Cinetic, IKI, and Caterpillar participated in a "kick-off" meeting to "kick-off" the beginning of the CACS Project. Holt testified that the purpose of the meeting was to introduce people, get schedules, and implement the work. Malnar did not attend the meeting because he had been removed as Project Manager and replaced by Kevin Wood, the Program Manager at the Griffin Facility. Halfway through the meeting, Wood asked IKI to leave the room. Holt told the IKI team that after IKI left the room, Wood expressed concern to Holt regarding using IKI as the conveyor supplier for the CACS project. Holt said that Wood indicated Caterpillar was having problems with IKI equipment at the Griffin facility and that Caterpillar was in the process of replacing some IKI equipment. IKI disputes the truth of these concerns and followed up with Wood on or around September 7, 2011, and September 18, 2011, to address them. The content and results of these two meetings are disputed.

On October 14, 2011, Dave Holt emailed his boss Jeff Jugan and informed Jugan that Cinetic won the CACS bid "[i]n part" because "IKI played a major role in developing a process [over/under roller conveyor] <u>and</u> making things work within the space allow (*sic*) us. Their

3

support…help (*sic*) us immensely. Our winning bid was not the lowest, but our layout and process made the difference." (Emphasis in original.) (IKI SOF Exh. F.) Holt went on to write: "We partner up with a supplier that had the inside track [years of business with Cat-Griffin] and now that we get the order, we pretty much blow them off[.]" *Id.* Holt said that this conduct is "not right, " and also stated that he was concerned that "[e]ngineering does not know the time, travel and expense that IKI had put into partnering with Cinetic to get this order[.]"*Id.*

Cinetic sent out a revised request for quotations to four companies, including Lathrup Industries ("Lathrup"), containing a drawing of the system design and layout for the CACS. On October 28, 2011, Cinetic informed Lathrup that Cinetic would purchase the conveyor equipment and parts from Lathrup. Because Lathrup was merely providing the equipment and parts for the conveyor system in the CACS project, its bid was over $500,000 less than IKI's.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *Celotex,* 477 U.S. at 324.

**DISCUSSION**

1.   *Joint Venture*

In its complaint, IKI first seeks a declaratory finding that an oral joint venture agreement existed between it and Cinetic, and second, IKI alleges that Cinetic breached that agreement. In its motion for summary judgment, Cinetic contends that no facts exists to prove IKI's contention that a joint venture agreement existed or that any alleged agreement was breached where IKI was bidding on a project. IKI responds that while it agrees that Cinetic would bid the project to Caterpillar, if chosen by Caterpillar as the general contractor for the CACS, Cinetic would then provide IKI with a purchase order for the conveyor portion of the CACS.

A joint venture is an association of two or more person to carry out a single enterprise for profit. *Powell v. Dean Foods Co.*, 7 N.E.3d 675, 699 (Ill. App. Ct. 2013). In the absence of an express formal agreement, a joint venture may be implied or established by surrounding facts and circumstances. *Herst v. Chark*, 579 N.E.2d 990, 693-94 (Ill. App. Ct. 1991). There must be a meeting of the minds showing the parties' intent to enter the joint venture. In addition to showing intent, there must also be: (1) a community of interest in the purpose of the joint venture, (2) a right of each member to direct and govern the policy and conduct of the other members, and; (3) a right to joint control and management of the property used in the enterprise; and (4) a sharing in profit and losses. *Thompson v. Hiter,* 826 N.E.2d 503, 510 ( Ill. App. Ct. 2005). "Possibly, the most important criterion of a joint venture is joint control and management of the property used in accomplishing its aims." *Herst*, 579 N.E.2d at 992. "[P]arol is admissible where a contract is incomplete or its language is ambiguous or uncertain." *Id.* at 994.

Here, the parties worked together from September 2010 to April 2011 to develop the design and layout of the CACS, thereby establishing the first factor, a community of interest in Cinetic obtaining the CACS contract. The evidence supports the second and third factors because Cinetic and IKI worked collaboratively for Cinetic to obtain the Caterpillar contract. Both Cinetic and IKI communicated directly with the potential client, Caterpillar, and incorporated Caterpillar's space and design needs in the development of the CACS design and layout. The fourth factor is also satisfied where both Cinetic and IKI stood to gain and lose financially from the CACS contract. Both companies stood to gain from winning the Caterpillar contract both stood to lose if Cinetic was not awarded the contract.

In its memorandum in support of summary judgment, Cinetic argues that the overhead conveyor design "was the fruit of a collaborative effort of Cinetic, IKI and Caterpillar, hence it could not have been misappropriated by the very entity that helped develop it." Although Cinetic is arguing that it did not misappropriate IKI's purported trade secret, Cinetic cannot have it both ways: it cannot argue on the one hand that the two companies worked together on the design for the Caterpillar bid, but on the other hand, there was no joint venture agreement between the parties. The misappropriation and breach of joint venture claims are based on the same course of conduct: the process of developing the CACS layout and the overhead conveyor system design.

Cinetic also argues that the written understanding between the parties trumps the purported oral agreement which IKI asserts is the basis of its joint venture agreement. According

5

to Cinetic, all six of the written proposals that IKI submitted to Cinetic expressly disclaims any agreement between the parties: "THERE ARE NO AGREEMENTS OR ORAL UNDERSTANDINGS OUTSIDE OF [IKI'S] PROPOSAL[S]" and "[IKI's] proposal[s] shall become a contract when accepted by [Cinetic] in writing and approved by an authorized executive of Industrial Kinetics, Inc." (Emphasis in original.) While the proposals contain the cited disclaimer, the disclaimer must be read in context. See e.g., *St. Paul Mercury Ins. v. Aargus Sec. Systems, Inc.*, 2 N.E.3d 458, 478 (Ill. App. Ct. 2013). The disclaimer provides that the proposal becomes a contract when accepted by Cinetic and approved by an authorized executive of IKI. It can reasonably be argued, and the evidence supports, that Cinetic approved the proposal when Cinetic incorporated it within Cinetic's overall proposal to Caterpillar, leading to Cinetic being awarded the CACS project. Similarly, it can also reasonably be argued that both IKI and Caterpillar accepted the contract by their conduct in collaborating on the bid and in attending the "kick-off" meeting. Therefore, the Court finds there is genuine issue of material fact regarding whether an oral joint venture agreement existed between the parties.

Additionally, the evidence is undisputed that Cinetic did not provide a contract to IKI for the installation of the conveyor, although the basis for Cinetic's failure to supply the contract is an issue of Holt's credibility where Holt indicated that Wood expressed concern about IKI's work. Thus, a genuine issue of material facts exists regarding whether Cinetic breached the purported joint venture agreement, precluding summary judgment.

2.   *Trade Secret Misappropriation*

IKI contends in its complaint that Cinetic misappropriated its trade secret, the overhead conveyor design concept. Cinetic responds that the design was not a trade secret. The parties agree that their dispute is governed by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 et seq.

For a misappropriation of trade secret claim under the ITSA, IKI must demonstrate that the overhead conveyor system design was a trade secret, that Cinetic misappropriated the trade secret, and that Cinetic used IKI's design in its business. See *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). Under the ITSA, a trade secret is:

> "[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being

generally known to other persons who can obtain economic value from its disclosure or use; and
(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

IKI's design must be shown to be a secret in two respects. First, the design must be sufficiently secret so as to hold economic value in its secrecy. Trade secret protection is precluded for "information generally known or understood within an industry even if not to the public at large." *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998). Second, IKI must have taken affirmative measures to maintain its design secret so as to obtain trade secret protection. *Learning Curve*, 342 F.3d at 722; see also *Jackson v. Hammer*, 653 N.E.2d 809, 816 (1995).

Illinois courts also look to six Illinois common law factors, derived from section 757 of the Restatement (First) of Torts to determine whether a trade secret exists under the ITSA: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Whether a trade secret exists is ordinarily a question of fact. *Learning Curve*, 342 F.3d at 723. The Seventh Circuit noted that defining a trade secret is one of "the most elusive and difficult concepts in the law to define." *Id.*, quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir.1978). "[T]he question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.' " *Id.* quoting *Lear Siegler*, 569 F.2d at 289.

The court finds at the outset that genuine issues of material fact exists regarding who designed the CACS layout and the overhead conveyor system. Cinetic contends that Malnar and Holt developed the conveyor system, while IKI contends that it developed the system design and layout for the CACS, which also included a design for the conveyor transport system. The evidence shows that IKI spent a great deal of time and money preparing drawings that incorporated Caterpillar's needs and addressed the facility space concerns over the course of approximately seven months. The evidence also shows that Holt, Post, and Malnar

7

communicated consistently throughout those months to prepare a system design and layout, leading to Cinetic obtaining the CACS contract. The evidence presented by each side requires a full hearing from a fact finder and summary judgment is denied. The Court need not examine the remaining trade secret and misappropriation factors.

3.  *Whether the ITSA precludes the common law claims*

Cinetic argues that IKI's common law claims are precluded by the ITSA because the claims are based on the same conduct as the trade secret claims, *i.e.,* Cinetic's placement of the overhead linear conveyor in the Griffin facility. Based on the Court's review of the complaint, the Court agrees that IKI's unjust enrichment and unfair competition claims are based on Cinetic's alleged conduct giving rise to IKI's trade secret misappropriation claim, and are therefore preempted by the ITSA. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir. 1995). Therefore summary judgment is granted on Counts and V and VI.

4.  *Breach of Fiduciary Duty*

In its complaint, IKI alleges Cinetic breached the fiduciary duty created by their oral joint venture agreement when Cinetic deprived IKI of its participation in the joint venture. Cinetic seeks summary judgment on IKI's breach of fiduciary duty claim, arguing that because there was no joint venture agreement, there could be no breach of fiduciary duty. Because the Court found there are genuine issues of material fact regarding whether a joint venture exists and whether Cinetic breached that agreement, the Court also denies summary judgment on the breach of fiduciary duty count.

**CONCLUSION**

Cinetic's motion for summary judgment is granted on the unjust enrichment and unfair competition counts (Counts V and VI), and denied on the joint venture (Counts I and II), breach of fiduciary duty (Count III), and trade secret (Count IV) counts. Thus, summary judgment is granted in part and denied in part.

IT IS SO ORDERED.

_____
Date: November 21, 2014

United States District Judge